# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

DR. VELTON C. WHITE and DONNA WHITE,

                     Plaintiffs,

       v.                                   Case No. 07-CV-892

MICHAEL C. MARSHALL,
SUPER SPRING ORTHODONTICS, LLC,
SPEEDALIGNERS, LLC,
NIGHTSHIFT, LLC, and
DANIEL L. BISHOP

                     Defendants.

_____

# ORDER

On October 4, 2007, Dr. Velton White ("White") filed his Complaint (Docket #1) in this action alleging copyright infringement. According to the complaint, the defendants (except Nightshift and Bishop, both of whom were only recently added as parties) infringed White's copyrights by using copies of White's photographs on their website and on other written material. On February 27, 2009 (after much legal wrangling over preliminary injunctions, statutory damages, and joinder of Donna White ("Donna White") as a necessary party), defendants, with the exception of Nightshift and Bishop, filed their Amended Answer and Counterclaim (Docket #31). On March 13, 2009, plaintiffs/counterclaim-defendants, the Whites, filed a Motion to Dismiss Counterclaim (Docket #35). The Whites later filed an Amended Complaint (Docket #57), in which they added defendants Nightshift and Bishop. In response to the Amended Complaint, defendants (again, with the exception of Nightshift and

Bishop) filed, on October 21, 2009, a Motion to Dismiss the Amended Complaint (Docket #65) and a Motion to Dismiss Michael Marshall (Docket # 67). For the reasons stated herein, the court grants the Whites's motion to dismiss the counterclaim, denies defendants' motion to dismiss the amended complaint, and denies the motion for dismissal of Michael Marshall.

## BACKGROUND

Dr. White, an orthodontist, developed a patented orthodontic device that uses springs to align teeth. White offers the orthodontic device for sale and use in his own practice. This device is the subject of U.S. Patent No. 6,604,943 ("the '943 patent) and U.S. Patent No. 6,935,859 ("the '859 patent"). In order to demonstrate the effectiveness of his orthodontic device, White took "before" and "after" photographs of his patients, and he uses these photographs in promotional materials. White has obtained federal copyright registration for these photographs. Defendant Michael Marshall ("Marshall") assisted White in promoting the orthodontic devices. In 2004, Marshall, Nancy Phillips ("Phillips"), and Daniel Bishop ("Bishop") formed defendant Super Spring Orthodontics, LLC ("Super Spring"), a company that provides orthodontic devices and services. White alleges that Super Spring launched a promotional website, www.speedaligners.com, which, according to White, displayed his copyrighted "before" and "after" patient photographs. In 2004, Phillips filed a federal lawsuit ("first federal suit") against White for having been wrongfully omitted as an inventor on the '943 and '859 patents, and White

-2-

counterclaimed against Phillips, Super Spring, and Marshall alleging infringement of the patent, infringement of White's copyrighted photographs, and unfair competition. Marshall also sued White in the Circuit Court of Racine County ("the Racine suit") alleging various claims. The first federal suit and the Racine suit were resolved when the parties reached a settlement agreement in June 2006. Pursuant to the parties' agreement, in exchange for monetary compensation, White licensed the '943 patent to Super Spring, promised to petition the U.S. Patent & Trademark Office ("PTO") to correct the inventorship on the '859 patent to include Phillips,[1] and granted Super Spring a license to use the copyrighted patient photographs through June 30, 2007.

White alleges in this case that the defendants continued to display his copyrighted photographs on www.speedalingers.com after the license expired on June 30, 2007. Counterclaimants Marshall, Superspring Orthodontics, LLC, ("Superspring"), and Speedaligners, LLC, ("Speedaligners") (collectively: "counterclaimants"[2]), raise the defense that White did not own valid copyrights to all the photographs at the time of the alleged infringement as well as at the time of the

---

[1] White also promised that if the U.S. Patent & Trademark Office denied his petition to correct the inventorship on the '859 patent, then he would license that patent to Super Spring.

[2] No party has raised the issue, but the court questions Superspring's and Speedaligners's standing as counterclaimants. Speedaligners was not a party to the settlement agreement on which all the claims in the counterclaim are based. Super Spring Orthodonics LLC was a party to the settlement agreement; however, the court has no knowledge of the relationship between that company and counterclaimant Superspring Orthodonics LLC (though the court assumes they are one in the same). Additionally, the court is not aware of the parties comprising Superspring or Speedaligners, as none of the defendants have filed certificates of interest in accordance with General L.R. 83.9. However, given that Marshall clearly has standing, and given that all the counterclaims are ripe for dismissal, the court will not expend any additional resources on this matter.

Case 2:07-cv-00892-JPS   Filed 12/23/09   Page 3 of 26   Document 78

settlement agreement. Counterclaimants assert that White fraudulently induced Super Spring and Marshall to settle the previous lawsuit by intentionally misrepresenting that he did own valid copyrights, that none of his rights relinquished in the settlement agreement had been transferred to another party, and that he was not aware of any occurrence that would render either the '943 or '859 patent unenforceable. They also claim that White breached that settlement agreement and the warranties and representations therein.

## ANALYSIS

### I.    LEGAL STANDARD

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of a plaintiff's (or counterclaimant's) complaint by asserting that the claimant failed to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), a claimant's complaint need only provide a short and plain statement of the claim, showing that the pleader is entitled to relief and sufficient to provide the defendant with fair notice of the claim and its basis. *Windy City Metal Fabricators & Supply, Inc. v. CIT Technical Financing Services, Inc.*, 536 F.3d 663, 667 (7th Cir. 2008). A pleader must show through her allegations that she is plausibly entitled to relief, instead of merely speculatively entitled to relief. *Id.* The court construes the complaint in the light most favorable to the claimant, accepts as true all well-pleaded facts alleged, and draws all possible

Case 2:07-cv-00892-JPS   Filed 12/23/09   Page 4 of 26   Document 78

inferences in the claimant's favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

## II.    THE WHITES'S MOTION TO DISMISS COUNTERCLAIM

### A.    Intentional Misrepresentation and Fraudulent Inducement

Claims I and II of the counterclaim allege intentional misrepresentation and fraudulent inducement. These are tort actions. Typically, under Wisconsin law, the economic loss doctrine ("ELD") bars recovery in tort for strictly economic losses arising from a contract – such as the settlement agreement (found at Docket #3, Mot. for Prelim. Inj'n, Ex. O) underlying all of counterclaimants' claims. John J. Laubmeier, *Demystifying Wisconsin's Economic Loss Doctrine*, 2005 Wis. L. Rev. 225 (2005). Economic losses are damages resulting from the loss of value of an inadequate or inferior product or goods, whereas non-economic losses would be damages relating to personal injuries or property damage unrelated to the products. *See Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 573 N.W.2d 842, 845 (Wis. 1998). Counterclaimants argue that the ELD should not apply to their tort claims because the contract at issue dealt with intellectual property, not with products or goods. However, counterclaimants offer no compelling rationale for this distinction.[3] Furthermore, in *Taurus IP v. Daimler Chrysler Corp.*, 519 F. Supp. 2d 905 (W.D.

---

[3] Though counterclaimants do not raise this point, Wisconsin law does hold that the ELD is not applicable to a contract for the provision of services. *Cease Electric*, 2004 WI 139, ¶ 52, 688 N.W.2d 462 (Wis. 2004). The court finds that the instant contract is much more akin to a contract for goods than a contract for services. Additionally, the policy considerations underlying the non-applicability of the ELD to service contracts – i.e. most service contracts are oral and informal, they are often for routine services, and they are often undertaken by unrepresented parties, *id.* ¶¶ 40-46 – are not implicated in the instant case.

-5-

Wis. 2007), Judge Crabb, applying Wisconsin law, held that the ELD was applicable to tort claims stemming from a settlement agreement resolving disputes over intellectual property – exactly like in the instant case. Thus, the court finds that the ELD is triggered because counterclaimants' losses are indeed purely economic (they relate only to the inferiority of the "goods" [i.e. the licenses and releases] counterclaimants purchased in the settlement agreement), and do stem from a contractual relationship (i.e. the settlement agreement from the previous lawsuit).

Counterclaimants attempt to distinguish *Taurus IP*, by arguing that the parties in that case were large commercially sophisticated entities, thus they had the resources to engage in the necessary due diligence before entering the settlement agreement that gave rise to that case. (Counterclaimants' Br. Opp. Mot. Dismiss at 7-8). Counterclaimants argue that they did not have the resources to uncover White's fraud. (Id.) However, that is no reason to not apply the ELD. The ELD has been applied, in Wisconsin, in the context of a noncommercial real estate transaction involving "at least one party [that] was not sophisticated and was not represented by counsel during negotiations," *Wickenhauser v. Lehtinen*, 2007 WI 82, ¶ 52, 734 N.W.2d 855; *see also id.* ¶¶ 39-42. Likewise, it has been applied in the context of residential, non-commercial, real estate transactions, *Linden v. Cascade Stone Co.*, 2005 WI 113, 699 N.W.2d 189 (Wis. 2005); *Below v. Norton*, 2008 WI 77, ¶ 23, 751 N.W.2d 351 (Wis. 2008). Thus, it is clear that counterclaimants, who were represented by counsel in the negotiation of the settlement agreement, (Settlm'nt

-6-

Wis. 2007), Judge Crabb, applying Wisconsin law, held that the ELD was applicable to tort claims stemming from a settlement agreement resolving disputes over intellectual property – exactly like in the instant case. Thus, the court finds that the ELD is triggered because counterclaimants' losses are indeed purely economic (they relate only to the inferiority of the "goods" [i.e. the licenses and releases] counterclaimants purchased in the settlement agreement), and do stem from a contractual relationship (i.e. the settlement agreement from the previous lawsuit).

Counterclaimants attempt to distinguish *Taurus IP*, by arguing that the parties in that case were large commercially sophisticated entities, thus they had the resources to engage in the necessary due diligence before entering the settlement agreement that gave rise to that case. (Counterclaimants' Br. Opp. Mot. Dismiss at 7-8). Counterclaimants argue that they did not have the resources to uncover White's fraud. (Id.) However, that is no reason to not apply the ELD. The ELD has been applied, in Wisconsin, in the context of a noncommercial real estate transaction involving "at least one party [that] was not sophisticated and was not represented by counsel during negotiations," *Wickenhauser v. Lehtinen*, 2007 WI 82, ¶ 52, 734 N.W.2d 855; *see also id.* ¶¶ 39-42. Likewise, it has been applied in the context of residential, non-commercial, real estate transactions, *Linden v. Cascade Stone Co.*, 2005 WI 113, 699 N.W.2d 189 (Wis. 2005); *Below v. Norton*, 2008 WI 77, ¶ 23, 751 N.W.2d 351 (Wis. 2008). Thus, it is clear that counterclaimants, who were represented by counsel in the negotiation of the settlement agreement, (Settlm'nt

Case 2:07-cv-00892-JPS   Filed 12/23/09   Page 6 of 26   Document 78

Agrm'nt at 2), should not be exempted from the ELD based on their self-assessed lack of sophistication.

Furthermore, the three main purposes of the ELD are to: (1) maintain the fundamental distinction between tort law and contract law; (2) protect commercial parties' freedom to allocate economic risk by contract; and (3) encourage the party best situated to assess the risk of economic loss, the commercial purchaser, to assume, allocate, or insure against that risk. *See Harley-Davidson Motor Co. v. Powersports, Inc.*, 319 F.3d 973, 985 (7th Cir. 2003); see also *Digicorp, Inc. v. Ameritech Corp.*, 262 Wis.2d 32, 662 N.W.2d 652, 659 (Wis. 2003). Noticeably, "to encourage the contracting parties to engage in due diligence so as to uncover fraud" is not listed as one of the primary purposes of the ELD. Thus, counterclaimants' inability to undertake due diligence – if in fact the assertion that they were unable to do is true – is not nearly as relevant as the fact that counterclaimants were certainly able to assess possible risk and negotiate for its allocation.

Counterclaimants next argue that their claims fall within a narrow exception to the ELD. (Counterclaimants Br. Opp. Mot. Dismiss at 4-6). That narrow exception, recognized by Wisconsin law, applies to certain fraud in the inducement claims. Under the fraud-in-the-inducement exception, the ELD does not bar claims where a party was fraudulently induced into entering into a contract where the fraud was extraneous, rather than interwoven, to the contract. *Kaloti Enterprises, Inc., v. Kellogg Sales Co.*, 2005 WI 111 ¶ 42, 699 N.W.2d 205 (Wis. 2005). To fall within

Case 2:07-cv-00892-JPS    Filed 12/23/09    Page 7 of 26    Document 78

the exception, counterclaimants "must show that: (1) there was an intentional misrepresentation[;] . . . (2) the misrepresentation occurred before the contract was formed[;] . . . and (3) the fraud [was] extraneous to, rather than interwoven with, the contract." *Id.* (internal citations omitted). Counterclaimants have successfully pled all five elements of intentional misrepresentation.[4] Also, the alleged misrepresentations undisputedly occurred before the contract was formed. However, the alleged fraud was interwoven with the contract, thus, counterclaimants are unable to fulfill the third prong of the exception.

Fraud is extraneous to the contract, and thus not barred by the ELD, if it concerns matters that do not relate to the quality or the characteristics of the "goods for which the parties contracted or otherwise involve[] performance of the contract." *Kaloti*, 2005 WI 111, ¶ 42. An example of an extraneous fraud is found in *Kaloti* in which Kellogg sold $124,000 worth of product to Kaloti, a secondary supplier that was in the business of buying product from a producer (such as Kelloggs) and reselling that product to large market stores. *Id.* ¶¶ 3-7. Kellogg, fully aware of Kaloti's intended use of the product, sold it to Kaloti without ever mentioning that

---

[4]The five elements necessary to plead intentional misrepresentation are:

(1) the defendant made a factual representation; (2) which was untrue; (3) the defendant either made the representation knowing it was untrue or made it recklessly without caring whether it was true or false; (4) the defendant made the representation with intent to defraud and to induce another to act upon it; and (5) the plaintiff believed the statement to be true and relied on it to his/her detriment.

*Ramsden v. Farm Credit Services of North Central Wisconsin ACA*, 590 N.W.2d 1, 7 (Wis. App.1998)(footnote omitted).

Case 2:07-cv-00892-JPS   Filed 12/23/09   Page 8 of 26   Document 78

Kellogg had recently begun selling its product directly to the same large market stores. *Id.* Thus Kellogg knew at the time it sold the product to Kaloti that Kaloti, because of actions taken by Kellogg, would be unable to use the product for the one purpose for which Kaloti was purchasing it. This was an extraneous misrepresentation because it did not affect the quality of the product or any other issue contemplated and negotiated in the contract. *Id.* ¶ 45. On the contrary, fraud is interwoven, and thus does not fall within the narrow exception to the ELD, if the misrepresentations regard "the quality or character of the goods sold." *Id.* ¶ 43 (quoting *Huron Tool and Engineering Co. v. Precision Consulting Services, Inc.*, 532 N.W.2d 541, 545 (Mich. App. 1995)). For example, had the Rice Krispy Treats Kellogg sold to Kaloti turned out to be strawberry Rice Bubbles (an Australian version of Rice Krispy Treats discontinued in the mid-1970s due to concerns that certain additives have been carcinogenic[5]), that would have been fraud that was interwoven.

Counterclaimants' misrepresentation claims consist of the following: 1) White represented that he had sole authority with respect to the rights granted and transferred in the Settlement Agreement, when, in fact, some copyrights on the photographs addressed in the Settlement Agreement are jointly owned by Donna White; 2) White represented that he had not assigned or transferred those rights over which he claimed ownership in the settlement agreement to anyone, but

---

[5]http://en.wikipedia.org/wiki/Rice_Krispies#cite_ref-xenter1_5-0

-9-

counterclaimants believe that White may have transferred certain of his copyrights to a company White owns; and 3) White represented that to his knowledge both the '943 and '859 patents were valid, and he knew of nothing that could render either of them unenforceable, yet counterclaimants contend that White did know of certain issues that could have made the '943 patent unenforceable. (Counterclaim ¶¶ 18, 32, 45-47). Each of these alleged misrepresentations pertain only to the quality of the "goods" (the goods being: resolution of the lawsuits, a license to the copyrighted photos, and a license for the '943 patent) counterclaimants received in the settlement agreement. These goods, counterclaimants believe, are inferior to that which White represented them to be at the time of the settlement agreement. If counterclaimants are correct, then White did engage in misrepresentations; however, those misrepresentations each pertain to issues interwoven into the contract, because they only affect the quality of what counterclaimants received in the deal. Hence, this is not a situation like in *Kaloti* where one party ended up being harmed by risks they could not have anticipated. Rather, counterclaimants could have easily negotiated for remedies should the rights White was relinquishing, and the licenses White was granting, turn out to be inferior to what White represented them to be, the same as a commercial purchaser could so negotiate in case the widgets he was purchasing turned out to be inferior to what the widget-maker represented them to be. As such, counterclaimants do not qualify for the fraudulent

-10-

Case 2:07-cv-00892-JPS   Filed 12/23/09   Page 10 of 26   Document 78

counterclaimants believe that White may have transferred certain of his copyrights to a company White owns; and 3) White represented that to his knowledge both the '943 and '859 patents were valid, and he knew of nothing that could render either of them unenforceable, yet counterclaimants contend that White did know of certain issues that could have made the '943 patent unenforceable. (Counterclaim ¶¶ 18, 32, 45-47). Each of these alleged misrepresentations pertain only to the quality of the "goods" (the goods being: resolution of the lawsuits, a license to the copyrighted photos, and a license for the '943 patent) counterclaimants received in the settlement agreement. These goods, counterclaimants believe, are inferior to that which White represented them to be at the time of the settlement agreement. If counterclaimants are correct, then White did engage in misrepresentations; however, those misrepresentations each pertain to issues interwoven into the contract, because they only affect the quality of what counterclaimants received in the deal. Hence, this is not a situation like in *Kaloti* where one party ended up being harmed by risks they could not have anticipated. Rather, counterclaimants could have easily negotiated for remedies should the rights White was relinquishing, and the licenses White was granting, turn out to be inferior to what White represented them to be, the same as a commercial purchaser could so negotiate in case the widgets he was purchasing turned out to be inferior to what the widget-maker represented them to be. As such, counterclaimants do not qualify for the fraudulent

-10-

Case 2:07-cv-00892-JPS   Filed 12/23/09   Page 10 of 26   Document 78

inducement exception to the ELD, and they must, therefore, confine themselves to contractual remedies.

Counterclaimants, likely well-aware that the alleged misrepresentations are clearly interwoven into the contract, ask that if the court grants dismissal as to the two tort claims, that the court construe the counterclaim as seeking rescission of the contract. (Counterclaimants' Br. Opp. Mot. Dismiss at 9-10). Counterclaimants base this entreatment on the final request for relief in their counterclaim, which asks for "such further relief as the court deems just and equitable." (Counterclaim ¶ 67(5)). If counterclaimants want to seek rescission of the contract because of misrepresentation, they are free to seek such relief in an answer and counterclaim to the Amended Complaint. However, it is clear from the briefings that the Whites would meet such a claim with a motion to dismiss on the basis of the doctrine of election of remedies. (Whites's Reply Br. Supp. Mot. Dismiss at 5-6). Thus, counterclaimants may only seek rescission of the contract if they are able to make good-faith arguments (i.e. arguments supported by applicable case law) that rescission is not foreclosed by the election of remedies doctrine.

**B.    Breach of Contract and Breach of Warranty**

The third and fourth claims asserted by counterclaimants consist of breach of contract and breach of warranty. The Whites assert that counterclaimants have failed to allege breach of contract because counterclaimants have not identified any promise to perform that was not performed. (Whites's Br. Supp. Mot. Dismiss at 8).

-11-

The Whites assert that counterclaimants have failed to allege breach of warranty because a warranty is merely a promise to indemnify the recipient for damages incurred if the warranted information turns out to be false, and counterclaimants have not alleged any damages. (Id. at 10-11). Thus, the Whites's basis for dismissal is that counterclaimants have failed to plead the necessary elements of a breach of contract claim and a breach of warranty claim. Counterclaimants' response to these assertions is essentially non-responsive. Counterclaimants' argument focuses on "notice pleading" and on when a party has a duty to disclose. (Counterclaimants' Br. Opp. Mot. Dismiss at 11-14). However, to the extent that counterclaimants assert that they do not need to plead each element of a cause of action for it to survive a motion to dismiss – as the Whites have alleged that they have failed to do – they are demonstrably wrong. As for the duty to disclose, that is wholly irrelevant to whether White failed to perform an action required of him by the contract, just as it is wholly irrelevant to whether counterclaimants have any damages stemming from the falsity of warranties in the contract.

### 1. Breach of Contract

A breach of contract is "non-performance of any contractual duty of immediate performance." Restatement of the Law of Contracts, § 312 (quoted in *Pure Mile Products Co-op v. National Farmers Organization* 219 N.W.2d 564, 571 (Wis. 1974)). A review of the settlement agreement that White is alleged to have breached shows that the following contractual duties of immediate performance were

-12-

imposed on White: 1) license the '943 patents to Super Spring; 2) license to Super Spring, until June 30, 2007, the photographs attached to Ex. 1 of the settlement agreement; 3) file a petition, before September 15, 2006, with the PTO to add Phillips as an inventor of the '859 patent; 4) if the PTO refused to correct the inventorship of the '859 patent, then to license the '859 patent to Super Spring; and 5) to file stipulations in both the first federal suit and the Racine suit to dismiss the actions with prejudice. Nowhere in counterclaimants' breach of contract claim is it alleged that White failed to perform any of those duties.

Counterclaimants instead base their breach of contract claim on allegations that "(1) White made false promises as consideration for the agreement; and (2) White raises in this action claims that were released by the terms of the settlement." (Counterclaim ¶ 58). However, the promises White is alleged to have falsely made were not promises to perform, they were representations. A misrepresentation is not a breach of contract. *See Christensen v. TDS Metrocom LLC*, 2009 WI App 21 ¶ 17 (Wis. App. 2008) (criticizing plaintiff for "blur[ring] the line between the two"). Similarly, raising claims in the present action that were released in the settlement agreement is not a breach of the settlement agreement. As the Whites point out, a release does not result in a breach upon filing of a suit; rather it provides the opposing party with an affirmative defense against the released claim. (Whites's Br. Supp. Mot. Dismiss at 9) (citing *Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 797 (7th Cir. 2005)) (explaining the difference between a release and a covenant not to sue).

-13-

Ultimately, both of counterclaimants' bases for their breach of contract claim are fundamentally inadequate for alleging a breach of contract – as counterclaimants themselves impliedly concede through their failure to proffer any argument to the contrary.

### 2. Breach of Warranty

As this court stated in *American Medical Systems, Inc. v. Medical Engineering Corp.*, 794 F. Supp. 1370 (E.D. Wis. 1992), "A warranty is an assurance by one party to a contract of the existence of a fact upon which the other party may rely[;] [i]t . . . amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue." *Id.* (rev'd on other grounds) (citing *Dittman v. Nagel*, 168 N.W.2d 190, 193 (Wis. 1969)). Thus, "the party relying on a breach of warranty has the burden of proof 'to show the warranty, the breach thereof, and that his [or her] loss resulted from the breach of such warranty.'" *Badzinski v. Patnode*, 2002 WI App 241, ¶ 14 (Wis. App. 2002) (quoting *Dittman*, 168 N.W.2d, at 196) (citations omitted).

Counterclaimants have alleged the existence of warranties, and the breach of warranties. (Counterclaim ¶¶ 62, 65). However, counterclaimants have not alleged any losses therefrom. If the remedy for a breach of warranty is that White must indemnify counterclaimants for the losses stemming from the breach of those warranties, then how can counterclaimants allege a cause of action for breach of warranties if they have suffered no losses from those breaches? Simply put, they cannot. If counterclaimants ever suffer damages from a breach of the warranties in

-14-

the settlement agreement, they will likely have a good breach-of-warranties cause of action against White. However, at the present time they do not, which counterclaimants themselves seem to concede, as they offer no argument refuting the Whites's assertion that counterclaimants failed to plead a breach of warranty claim by failing to plead any losses.

### 3. Donna White

Donna White is named as a counterclaim-defendant in the counterclaims, despite the fact that all of the counterclaims arise from a settlement agreement to which she was not a party and that resolved litigation to which she was not a party. The Whites charge that none of the claims state a claim for relief against Donna White, and thus she must be dismissed as a counterclaim-defendant (though not from the action in its entirety). (Whites's Br. Supp. Mot. Dismiss at 11-12). As counterclaimants do not dispute this assertion – and as the court agrees that counterclaimants have not alleged any claims against Donna White – the court will dismiss any counterclaims against Donna White. The court will further dismiss all the counterclaims in regards to Dr. White, based on the foregoing analysis as to the sufficiency of the claims themselves.

## III. DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

On October 21, 2009, defendants Super Spring, Speedaligners, and Marshall ("defendants") filed a Motion to Dismiss Amended Complaint (Docket #65). The

-15-

Whites, on November 14, 2009, filed their brief in opposition to the motion to dismiss. Defendants did not file a reply brief.

The Whites's amended complaint states a claim for copyright infringement against defendants. The Whites allege defendants infringed the Whites's copyrighted photographs by continuing to display the photographs on the Nightshift and Speedaligners websites after the June 30, 2007, expiration of the license granted in the settlement agreement. Defendants seek dismissal of the amended complaint pursuant to Rule 12(b)(6) because, according to defendants, the Whites have failed to sufficiently plead copyright infringement against defendants because the Whites have failed to allege ownership of the various copyrights that defendants are alleged to have infringed.

To state a claim for copyright infringement, a plaintiff must allege: "(1) ownership of a valid copyright[;] and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Telephone Service, Inc.,* 499 U.S. 340, 361 (1991). Defendants do not dispute that the Whites's complaint fulfills the second prong. Rather, defendants maintain that the Whites's complaint does not fulfill the first prong, because, according to defendants, the complaint does not allege that the copyrights are valid or that the Whites own the copyrights. (Defs. Br. Supp. Mot. Dismiss Compl. at 3).

Though defendants contest whether validity has been sufficiently alleged in the amended complaint, defendants offer no facts or argument in support of this

-16-

proposition. The court finds that the allegations in paragraph seventeen of the amended complaint – stating that White registered copyrights for many of his photographs, and giving the copyright registration numbers of the photographs at issue in this case – sufficiently alleges the validity of the copyrights, especially given defendants' lack of argument to the contrary. Additionally, Certificates of Registration from the U.S. Copyright Office are public records that the court may take judicial notice of without converting a Rule 12(b)(6) motion to a motion for summary judgment. *Brown v. South Florida Fishing Extreme, Inc.*, 2008 WL 2597938, 1 (S.D. Fla. 2008); *Ajaxo, Inc. v. Bank of America Technology and Operations, Inc.*, 2007 WL 4180361 (E.D. Cal. 2007). Thus, the court takes judicial notice of the certificates of registration attached as exhibits A - M to Whites's Motion for Preliminary Injunction (Docket #3). Given the sufficiency of the allegations in the amended complaint, as well as the corroborating public records, the court finds no basis for defendants' argument that the Whites have not sufficiently alleged that the copyrights are valid.

The defendants also contest whether present ownership of the copyrights has been sufficiently alleged. Though defendants state that present ownership has not been alleged, their arguments do not pertain to the insufficiency of the pleading, but rather focus on matters external to the amended complaint. Namely, defendants point to a confidentiality and nondisclosure agreement of a company of which White is a founder (the company is named Vector 3 Orthodontics) as indicating that White

has transferred his ownership of the copyrights to Vector 3.[6]  (Defs. Br. Supp. Mot. Dismiss Am. Compl. at 5-6).  There are serious flaws with defendants' argument. First, defendants have not even attempted to persuade the court that the referenced confidentiality and nondisclosure agreement is a public document, thus permitting the court to take judicial notice of it without converting the Rule 12(b)(6) motion to a summary judgment motion.  This is particularly incredible as defendants previously filed a motion to dismiss the original complaint that was denied in part as a result of defendants relying on materials outside the pleadings.  (See Order dated March 27, 2008, at 7).  Not only is the court presented with no rationale justifying reference to the confidentiality and nondisclosure agreement, but the court is also presented with no credible argument as to why the document is relevant to a motion to dismiss. Defendants argue that the agreement "implies" and "suggests" that Vector 3 owns the copyrights.  (Defs. Br. Supp. Mot. Dismiss Am. Compl. at 5).  Even if the document was one that the court could properly consider on a Rule 12(b)(6) motion – which defendants have not argued that it is, thus the court is not going to consider the document – it would be irrelevant, because, at best, the document raises factual questions as to the Whites's claims.  Such factual questions cannot justify dismissal of a claim.

---

[6] Defendants state that the confidentiality and nondisclosure agreement is at "Exhibit H to document 8".  The court does not know what "document 8" means, and can only assume that defendants mean Docket #8.  However, there is no Exhibit H attached to the document filed at Docket #8.  Rather, the document to which defendants are undoubtedly referring is attached as "Exhibit NDA V3O" to the document at Docket #8.

Case 2:07-cv-00892-JPS   Filed 12/23/09   Page 18 of 26   Document 78

In contrast to the confidentiality and non-disclosure document, to which defendants point, stands the certificates of registration of the copyrights at issue. The Whites, unlike defendants, have demonstrated that these certificates are the type of documents that the court may take notice of on a Rule 12(b)(6) motion. Because "[a] certificate of registration raises the presumption of copyright validity and ownership[,]" *Dream Games of Arizona, Inc. v. PC Onsite*, 561 F.3d 983, 987 n.2 (9th Cir. 2009), and because defendants have offered nothing other than conjecture as rebuttal to that presumption, the court is obliged to deny defendants' motion to dismiss the amended complaint.

## IV.   MARSHALL'S MOTION TO DISMISS

On October 21, 2009, defendant Marshall filed a Motion to Dismiss (Docket #67) from the amended complaint. The Whites, on November 14, 2009, filed their brief in opposition to the motion to dismiss. Marshall did not file a reply brief.

Marshall argues that the Whites's amended complaint fails to support a cause of action against Marshall personally for copyright infringement. Marshall advances two arguments in support of this contention. The first argument is that the Whites's allegations are insufficient to warrant "piercing the corporate veil." (Marshall's Br. Supp. Mot. Dismiss Am. Compl. at 3-6). The second argument is that the Whites's allegations do not fulfill the necessary requirements for charging a corporate officer with personal liability for a corporation's infringement. (Id. at 3-8).

-19-

Marshall's argument as to "piercing the corporate veil" is misplaced. To "pierce the corporate veil" is to hold the owners of a corporation to be personally liable for the corporation's liabilities. This is only done when "the corporation's 'affairs are organized, controlled and conducted so that the corporation has no separate existence of its own and is the mere instrumentality of the shareholders and the corporate form is used to evade an obligation, gain an unjust advantage or to commit an injustice.'" *Capsavage v. Esser*, N.W.2d 888,890 (Wis. 1999) (quoting *Consumer's Co-op v. Olsen*, 419 N.W.2d 211, 213-14 (1988)). In the instant case, the Whites are not seeking to pierce the corporate veil and hold Marshall liable as an owner for the corporation's copyright infringement. Rather, the Whites are seeking to hold Marshall personally liable for the role he played – as an owner and manager in the corporations – in the alleged infringement. Thus, nothing in the Whites's amended complaint triggers a veil-piercing analysis. *See Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978) (explaining inapplicability of veil-piercing analysis in regards to whether a corporate officer or owner should be personally liable for the role he played in copyright infringement).

Marshall's second argument – that the Whites's allegations do not fulfill the criteria necessary to impose personal liability – invites the question of what the test for imposing liability should be. Marshall posits that the applicable test is that set forth by the Seventh Circuit in *Dangler v. Imperial Mach. Co.*, 11 F.2d 945 (7th Cir. 1926):

-20-

> [I]n the absence of some special showing, the managing officers of a corporation are not liable for the infringements of such corporation, though committed under their general direction . . . .
>
> It is when the officer acts willfully and knowingly- that is, when he personally participates in the manufacture or sale of the infringing article (acts other than as an officer), or when he uses the corporation as an instrument to carry out his own willful and deliberate infringements, or when he knowingly uses an irresponsible corporation with the purpose of avoiding personal liability- that officers are held jointly with the company. The foregoing are by no means cited as the only instances when the officers may be held liable, but they are sufficient for the present case.

*Id.* at 947. The Whites critique *Dangler* on the basis of its age, but offer no reason as to why it should not apply, nor any argument in support of the idea that their amended complaint contains sufficient allegations to meet the standard set forth in *Dangler*. (Whites's Br. Opp. Mot. Dismiss Am. Compl. at 6-7). Rather, the Whites contend that a different standard entirely should apply. The standard proffered by the Whites is that espoused by this court in *Microsoft Corp. v. Ram Distribution, LLC*, 625 F. Supp. 2d 674, 682 (E.D. Wis. 2008):

> An individual may incur liability for a corporation's copyright infringement under two theories: 1) vicarious liability; and 2) contributory liability. An individual is vicariously liable for infringing activity if he has the right and ability to supervise that activity and has an obvious and direct financial interest in the infringing activity. A party may be contributorily liable if he directly participates in the infringing activity or induces, causes, or materially contributes to the infringing conduct of another.

*Id.* at 682 (internal citations omitted)(citing *Burdick v. Koerner*, 988 F. Supp. 1206, 1209 (E.D. Wis.1998)).

-21-

It is clear from the amended complaint that under the standard proffered by the Whites, the claim against Marshall for individual liability should survive a motion to dismiss. The amended complaint alleges that Marshall has identified himself as the managing director of Speedaligners and Nightshift, and as the general manager of Super Spring, and that he has a significant ownership interest in these companies.[7] (Am. Compl. ¶¶ 24-32). Thus, Marshall would have had a supervisory role over the content of the websites, and arguably a direct financial interest in the alleged infringement (to the extent that the alleged infringing activity helped to sell more of the companies' products).

Conversely, it appears clear from the amended complaint that, under the *Dangler* standard proffered by Marshall, the claim against Marshall for individual liability would be far less likely to survive a motion to dismiss. This is especially true if the court were simply to adopt the standard exactly as it is articulated in *Dangler*, for there is no allegation that Marshall participated directly in the alleged infringement, or that the corporations were set up as sham corporations in order to effectuate the alleged infringement.

Thus, the question of whether Marshall's motion to dismiss should be granted pivots largely on the standard by which the claim for individual liability is judged. In deciding which standard to adopt, or whether the two standards necessarily conflict, the court is at a severe disadvantage as a result of the parties' failure to adequately

---

[7] As previously mentioned, the defendants/counterclaimants in this case failed to file a certificate of interest, so the court cannot know the extent of Marshall's ownership interest in these companies.

brief the issue. Both parties simply assert that their preferred standard applies, and wholly neglect to address why each other's preferred standard should not apply. In doing so, the parties seek to foist onto the court the duty that rightfully falls to themselves, for, in an adversarial system, "[i]t is not th[e] court's responsibility to research and construct the parties' arguments." *U.S. v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000).

However, it is this court's responsibility to ensure that the proper legal standard is applied. Since the parties have offered such minimal guidance on this issue, and since, based on the court's own research into the matter, the answer does not appear to be a clear one, the court will issue its ruling on this motion based on what it perceives the correct standard to be, but will allow the parties to revisit the subject on summary judgment.

It seems that *Dangler* is still the law of this circuit. *See The Drink Group, Inc. v. Gulfstream Commc'ns, Inc.*, 7 F. Supp. 2d 1009, 1010 (N.D. Ill. 1998) ("*Dangler* is still the law of this Circuit"); *Jones Day v. Blockshopper LLC*, 2008 WL 4925644 (N.D. Ill 2008) (applying *Dangler*). However, *Dangler* importantly states: 1) that officers should not be found liable for infringement that occurs under their "general direction"; and 2) that the examples given in *Dangler* are not the only instances in which an officer may be found personally liable. 11 F.2d at 947. Further, since *Dangler*, courts have been expanding the situations in which the "special showing" required by *Dangler* is met. *See Peaceable Planet, Inc. v. Ty, Inc.*, 185 F. Supp. 2d

-23-

893, 896 (N.D. Ill. 2002) (expounding upon situations in which the "special showing" is met). Additionally, it is abundantly clear that the standard proffered by the Whites, and adopted by this court in *Ram Distribution*, is widely accepted among the various circuits, *See Nelson-Salabes, Inc. v. Morningside Development LLC*, 284 F.3d 505 513 (4th Cir. 2002); *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1022 (9th Cir. 2001); *Pinkham v. Sara Lee Corp.*, 983 F.2d 824, 834 (8th Cir.1992); *Southern Bell Tel. & Tel. Co. v. Assoc. Tel. Directory Publishers*, 756 F.2d 801, 811 (11th Cir.1985); *Gershwin Pub. Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1163 (2d Cir.1971). Thus, the most reasonable marriage of this latter, more lenient vicarious liability, standard (which allows imposition of personal liability where an individual had a supervisory role over infringing activity and a direct financial interest in the infringing activity), and the more demanding *Dangler* standard (which requires a "special showing" to impose individual liability), is to hold that an individual that is an officer and owner in a corporation, and who satisfies the two pronged vicarious liability test articulated above, necessarily satisfies the *Dangler* special showing requirement. The ultimate questions as to whether Marshall truly did have a supervisory role, and/or a direct financial interest in the alleged infringement, will be questions of fact. However, at this stage, those elements have been sufficiently alleged. Accordingly, Marshall's motion to dismiss will be denied.

-24-

## CONCLUSION

For the reasons stated above, the Whites's motion to dismiss the counterclaims will be granted; defendants/counterclaimants' motion to dismiss the amended complaint will be denied; and Marshall's motion to dismiss himself from this action will be denied. The court notes that, during the pendency of these motions, defendants Bishop and Nightshift were served with the amended complaint, and these defendants filed "Responses" to the amended complaint (see Docket ##'s 73, 74). Because Nightshift's response was not filed by a licensed attorney, the Whites have moved to have the response stricken, and to have default judgment entered against Nightshift as a result of its failure to file a proper answer or motion within the specified time. (See Motion to Strike, Motion for Entry of Default, Docket #76). The court will not rule on this motion at this time, as the time allotted for Nightshift's response has not yet elapsed.

Accordingly,

**IT IS ORDERED** that plaintiffs/counterclaim-defendants' Motion to Dismiss Counterclaim (Docket #35) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that defendants' Motion to Dismiss Amended Complaint (Docket #65) be and the same is hereby **DENIED**; and

-25-

**IT IS FURTHER ORDERED** that Marshall's Motion to Dismiss Marshall (Docket #67) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 23rd day of December, 2009.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge